Jeffrey A. Silvestri (NV Bar No. 5779)
MCDONALD CARANO WILSON LLP
2300 West Sahara Avenue
Suite 1000
Las Vegas, NV  89102
Phone: (702) 873-4100
Facsimile: (702) 873-9966
Email:  agordon@mcdonaldcarano.com
Email:  jsilvestri@mcdonaldcarano.com

Frederick S. Berretta (*pro hac vice*)
Peter Law (*pro hac vice*)
KNOBBE, MARTENS, OLSON & BEAR, LLP
12790 El Camino Real
San Diego, CA  92130
Phone: (858) 707-4000
Facsimile:  (858) 707-4001
Email:  fred.berretta@knobbe.com
Email:  peter.law@knobbe.com

Attorneys for Plaintiff
SILVER STATE INTELLECTUAL TECHNOLOGIES, INC.


Robert C. Ryan (NV Bar No. 7164)
HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511
Phone:  (775) 327-3042
Facsimile:  (775) 786-6179
Email:  rcryan@hollandhart.com

Christopher B. Hadley (*pro hac vice*)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah  84101
Telephone:  (801) 799-5800
Facsimile:  (801) 799-5700
Email:  cbhadley@hollandhart.com

Craig R. Smith (*pro hac vice*)
LANDO & ANASTASI, LLP
One Main Street, Eleventh Floor
Cambridge, MA  02142
Phone: (617) 395-7000
Facsimile: (617) 395-7070
Email:  csmith@lalaw.com

Attorneys for Defendant
FOURSQUARE LABS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| SILVER STATE INTELLECTUAL TECHNOLOGIES, INC., a Nevada corporation, | ) ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) Case No. 2:12-cv-01308-GMN-PAL ) |
| v. | ) **JOINT MOTION TO STAY** ) **LITIGATION PENDING** *INTER* ) *PARTES* **REVIEW** |
| FOURSQUARE LABS, INC., a Delaware corporation, | ) ) ) |
| Defendant/Counterclaim Plaintiff. | ) ) |

Plaintiff/Counterclaim defendant Silver State Intellectual Technologies, Inc. ("Silver State") and Defendant/Counterclaim plaintiff Foursquare Labs, Inc. ("Foursquare") jointly move to stay all proceedings in this case, *except* for Foursquare's Second Motion to Dismiss, pending a determination of an *Inter Partes* Review of U.S. Patent No. 7,343,165 (the '165 Patent).

## I.     **INTRODUCTION**

The Parties jointly move the Court to stay the pending litigation while the United States Patent and Trademark Office ("USPTO") conducts *Inter Partes* Review (IPR) proceedings regarding the validity of the claims of the '165 patent.  *Inter Partes* Review is a procedure governed by the USPTO and put in place to "establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs."  *Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions*, 77 Fed. Reg. 157 (Aug. 14, 2012), p. 48612.

All four factors identified in Local Rule 16.1-20 regarding the stay of litigation weigh strongly in favor of granting a stay here.  First, a stay will not prejudice or unfairly benefit either party because both parties to this action join in this motion and believe a stay is

1  warranted.  Second, IPR has the potential to simplify or even entirely dispose of this case, and

2  a stay will promote efficiency and judicial economy, as well as conserve the resources of the

3  parties and the Court.   Third, this case is still in the early stages and discovery is not

4  complete.  Fourth, no trial date has been set.

5        Accordingly, the parties respectfully request that the Court stay this action (with one

6  exception) pending final, non-appealable resolution of the IPR.  The parties request that the

7  Court decide Foursquare's Second Motion to Dismiss because it may affect the claims that

8  need to be addressed in the IPR.

9        The parties also intend to participate in the settlement conference with Magistrate

10  Judge Leen on December 18, 2013.

11  **II.      BACKGROUND**

12        On October 4, 2013, Silver State filed its Third Amended Complaint, alleging direct

13  infringement of claim 1 of the '165 Patent and indirect infringement of claim 2 and a few

14  dependent claims.  *See* Silver State's Third Amended Complaint, ECF No. 61.  On October

15  21, 2013, Foursquare filed its Second Motion to Dismiss Silver State's claims of indirect

16  patent infringement.  *See* ECF No. 65.  If granted, Silver State's complaint for patent

17  infringement would be limited to claim 1 of the '165 Patent.

18

19  **III.      *INTER PARTES* REVIEW**

20        The America Invents Act ("AIA") created procedures "to establish a more efficient

21  and streamlined patent system that will improve patent quality and limit unnecessary and

22  counterproductive litigation costs." H.R. Rep. No. 112-98 (part 1), at 40 (2011).  One of the

23  ways Congress sought to streamline the patent system was with a new proceeding called *inter*

24  *partes* review, which allows expeditious review by the PTO of patents.  *Inter partes* review

25  allows a full adversarial challenge—including an oral hearing and even discovery—to the

26  validity of the patents. 35 U.S.C. §§ 311(b), 316(a); 37 C.F.R. §§ 42.51, 42.53. The statute

27

established the Patent Trial and Appeal Board (PTAB), and each IPR is conducted before a panel of three technically-trained patent judges of the PTAB. 35 U.S.C. §§ 6, 311.

The first step in the *inter partes* review is for the challenger to file a written petition seeking such review. The patent owner may file a preliminary response within three months. 35 U.S.C. § 313. The PTAB then determines whether to initiate IPR based on whether the petitioner has shown "a reasonable likelihood that the petitioner will prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). The PTAB must make this decision within six months of the petition. 35 U.S.C. § 314. If IPR is initiated, the PTAB must issue a final determination within one year, which may be extended up to six months for good cause shown. 35 U.S.C. § 316(a)(11).

On November 18, 2013, Foursquare filed a Petition for *Inter Partes* Review of the '165 Patent, asserting that the patent claims asserted in Silver State's Third Amended Complaint patent are invalid. *See* Exhibit 1, Petition for *Inter Partes* Review ("Petition"). The Petition identifies five prior art references that either alone or in combination invalidate claims 1-5 and 7-9 of the '165 patent. *Id.*, at 3-5.

## IV.    **LEGAL STANDARD**

It is well-established that district courts have the "inherent power" to manage their dockets and stay proceedings. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). Courts have also "consistently recognized the inherent power of the district courts to grant a stay pending reexamination of a patent." *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 849 (Fed. Cir. 2008); *Ethicon, Inc. v. Quigg*, 349 F.2d 1422, 1426-27 (Fed. Cir. 1988).

"Courts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated or lucidly narrowed by the patent reexamination process and the expertise of [PTO] officers." *Rembrandt Gaming Techs., LP v. Boyd Gaming*

*Corp.*, No. 2:12-cv-00775-MMD-GWF, 2012 WL 6021339, at *1 (D. Nev. Dec. 3, 2012) (internal quotations and citation omitted).  Thus, a stay is "'particularly justified where the outcome of the reexamination would be likely to assist the court in determining patent validity and, if the claims were canceled in the reexamination, would eliminate the need to try the infringement issue.'"  *See, e.g., Convergence Techs.*, 2012 WL 1232187, at *1 (quoting from *In re Cygnus Telecomm'ns Tech.¸ LLC, Patent Litigation*, 385 F. Supp. 2d 1022, 1023 (N.D. Cal. 2005)); *Droplets, Inc. v. Yahoo! Inc.*, 2013 WL 5116002, at *1 (N.D. Cal. Sept. 13, 2013) (order granting stay pending inter partes reexamination and noting that "final determination of the USPTO is quite likely to simplify issues.").

Although *inter partes* review is a relatively new procedure, district courts within the Ninth Circuit have repeatedly affirmed that the "liberal policy" applies with full force to *inter partes* review proceedings. *See, e.g., Star Envirotech, Inc. v. Redline Detection, LLC*, 2013 WL 1716068, at *2 (C.D. Cal. Apr. 3, 2013) (granting a stay pending petition for *inter partes* review).

Local Rule 16.1-20 governs stays of litigation pending the outcome of a reexamination proceeding before the USPTO.  *Inter parties* review is very similar to reexamination.  "Whether the Court stays litigation upon the request of a party will depend on the circumstances of each particular case, including without limitation: (1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party, (2) whether a stay will simplify the issues in question and the trial of the case, (3) whether discovery is complete, and (4) whether a trial date has been set."  LR 16.1-20.

The Parties agree that, on balance, these factors weigh in favor of a stay of this action pending completion of the IPR proceedings.

## V.  A STAY OF THE LITIGATION IS APPROPRIATE

All four factors considered in deciding whether to grant a stay weigh strongly in favor of granting a stay here. Before the Court and the parties expend further resources, the PTO should be allowed to perform its review, which will narrow the issues in this case and possibly eliminate them altogether.

### A.  A Stay Will Not Prejudice the Parties

Neither party will be unduly prejudiced by a stay.  Indeed, both parties have agreed that a stay is appropriate.

### B.  *Inter Partes* Review Will Simplify the Issues for Trial

The IPR will streamline this litigation and may entirely eliminate it. The IPR covers all of the claims asserted by Silver State in its Third Amended Complaint.  Even if one or more claims survive, the IPR will likely narrow the issues in any future litigation.  Because IPR will simplify issues in this litigation, this factor also strongly weighs in favor of a stay.

### C.  The Stage of This Case Favors a Stay

This case is still in the early stages of discovery.  The parties have exchanged initial discovery, but no depositions have been scheduled.  Thus, fact discovery is not complete.  In addition, expert discovery has not begun.  "'A stay is particularly appropriate for cases in the initial stages of litigation or in which there has been little discovery.'" *Internet Patents Corp. v. eBags, Inc.*, Case No. C 12-03385 SBA, 2013 U.S. Dist. LEXIS 122868, at *6-*7 (N.D. Cal. Aug. 28, 2013) (quoting *Tse v. Apple Inc.*, 2007 WL 2904279, at *2-3)).

### D.  A Trial Date Has Not Been Set

Due to the early stage of this case, a trial date has not been set yet.

## VI.  THE COURT SHOULD DECIDE FOURSQUARE'S SECOND MOTION TO DISMISS

Foursquare's Second Motion to Dismiss is pending and should still be ruled on by the Court because it could further narrow the issues that will be addressed in the litigation and the IPR.  The motion requests that the Court dismiss Silver State's claims of indirect

infringement.   Silver State's Third Amended Complaint alleges that Foursquare indirectly infringes claims 2-5 and 7-9 of the '165 Patent.  If Foursquare's Motion to Dismiss is granted, these claims would no longer be part of the case.  Thus, claim 1 would be the only remaining patent claim.

This narrowing of the case could also help limit the IPR.  Foursquare's IPR currently covers all of the claims alleged in Silver State's Third Amended Complaint.  If Silver State's complaint is limited to just claim 1 as a result of Foursquare's Motion to Dismiss, then the parties may be able to limit the IPR to claim 1 as well.

Accordingly, the parties request that the Court rule on Foursquare's Second Motion to Dismiss.

## VII.   **CONCLUSION**

Because all four factors in determining whether a stay is appropriate weigh in favor of a stay, Foursquare and Silver State respectfully request the Court stay this action pending final, non-appealable resolution of IPR of the '165 Patent.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: November 25, 2013          By: /s/ Frederick S. Berretta
                                  Frederick S. Berretta (*pro hac vice*)
                                  Peter Law (*pro hac vice*)

and

MCDONALD CARANO WILSON LLP

Jeffrey A. Silvestri

Attorneys for Plaintiff
SILVER STATE INTELLECTUAL
TECHNOLOGIES, INC.

LANDO & ANASTASI, LLP

Dated: November 25, 2013          By: /s/ Craig R. Smith
                                      Craig R. Smith (*pro hac vice*)

                                  and

                                  HOLLAND & HART LLP

                                      Robert C. Ryan
                                      Christopher B. Hadley

                                  Attorneys for Defendant
                                  FOURSQUARE LABS, INC.



**IT IS SO ORDERED:**

UNITED STATES OCI KVTCVG JUDGE

Dated: December 11, 2013

**PROOF OF SERVICE**

I hereby certify that on November 25, 2013, I caused the JOINT MOTION TO STAY LITIGATION PENDING INTER PARTES REVIEW to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all attorneys of record.

Executed on November 25, 2013, at Cambridge, Massachusetts.

/s/ Craig R. Smith
Craig R. Smith (*pro hac vice*)

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Foursquare Labs, Inc.
Petitioner

v.

Silver State Intellectual Technologies, Inc.
Patent Owner

Patent No. 7,343,165
Filing Date: April 11, 2001
Issue Date: March 11, 2008
Title: GPS PUBLICATION APPLICATION SERVER

_____

*Inter Partes* Review No. _____

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

## Table of Contents

I.      MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(a)(1) ......................... 1

    A.      Real Party-in-interest under 37 C.F.R. § 42.8(b)(1)................................ 1

    B.      Related Matters under 37 C.F.R. § 42.8(b)(2) ........................................ 1

    C.      Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ..................... 1

    D.      Service Information ................................................................................. 2

    E.      Power of Attorney ................................................................................... 2

II.     PAYMENT OF FEES - 37 C.F.R. § 42.103 ................................................. 3

III.    REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R.
       §§ 42.104 AND 42.108 ................................................................................ 3

    A.      Grounds for Standing under 37 C.F.R. § 42.104(a) ............................... 3

    B.      Identification of Challenge Under 37 C.F.R. § 42.104(b) and
          Statement of Precise Relief Requested .................................................... 3

    C.      Requirements for Inter Partes Review 37 C.F.R. § 42.108(c) ............... 5

IV.     DESCRIPTION OF THE CHALLENGED CLAIMS .................................... 5

V.      CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3) ................... 7

    A.      Legal Overview ...................................................................................... 7

    B.      "User-Specific Space in Memory" and "User Specific Data
          Space" ..................................................................................................... 8

    C.      "Accessible Over a Computer Network to a Specific User" .................. 8

    D.      "Additional Data Regarding the User, the Additional Data Being
          Related to the Geographic Location of the User" and "Additional
          Information Related to the Geographic Location of the
          Individual" .............................................................................................. 9

    E.      "Receiving from the User an Access List of Possible Requesters"
          and "the Access List Being Received From the Individual
          Associated with the PCD" .................................................................... 10

    F.      "GPS Server" ....................................................................................... 11

VI.     THE '165 PATENT IS NOT ENTITLED TO THE PRIORITY DATE
       OF ITS PROVISIONAL APPLICATION ................................................. 11

VII.    CLAIMS 1-5 AND 7-9 OF THE '165 PATENT ARE INVALID ............... 13

i

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

| | | |
|---|---|---|
| A. | GROUND 1 – Claims 1 is Anticipated by Granstam | 13 |
| B. | GROUND 2 – Claims 2-5 and 7-9 Are Anticipated by Granstam | 20 |
| C. | GROUND 3 – Claim 1 is Anticipated by Fraccaroli | 25 |
| D. | GROUND 4 – Claim 1 is Obvious Over Newman in View of Granstam | 32 |
| E. | GROUND 5 – Claim 1 is Anticipated By Kenichi | 42 |
| F. | GROUND 6 – Claims 2-5 and 7-9 Are Obvious Over Kenichi in View of Makoto | 50 |
| VIII. | CONCLUSION | 60 |

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

## List of Exhibits

**Exhibit 1001:**  U.S. Patent No. 7,343,165 ("the '165 Patent")

**Exhibit 1002:**  U.S. Patent No. 6,587,691 ("Granstam")

**Exhibit 1003:**  U.S. Patent No. 6,549,768 ("Fraccaroli")

**Exhibit 1004:**  U.S. Patent No. 5,835,907 ("Newman")

**Exhibit 1005:**   Japanese Patent Pub. No. 2000-322446 ("Kenichi")

**Exhibit 1006:**  Certified Translation of Kenichi and affidavit of translator

**Exhibit 1007:**  Japanese Patent Pub. No. 2000-275319 ("Makoto")Exhibit 1008:Certified Translation of Makoto and affidavit of translator

**Exhibit 1009**:  Original Complaint for Patent Infringement by Silver State, Dkt. No. 1, No. 2:12-cv-1308 (D. Nev. filed July 25, 2012).

**Exhibit 1010**:  Signed Waiver of Service form, as filed by Silver State, Dkt. No. 13, No. 2:12-cv-1308 (D. Nev. filed Nov. 16, 2012)

**Exhibit 1011**:  Silver State's Opening Claim Construction Brief, Dkt. No. 52, No. 2:12-cv-1308 (D. Nev. filed August 23, 2013)

**Exhibit 1012**:  Silver State's Reply Claim Construction Brief, Dkt. No. 59, No. 2:12-cv-1308 (D. Nev. filed September 13, 2013)

**Exhibit 1013**:  Provisional Patent Application No. 60/196,575, filed on Apr. 11, 2000

**Exhibit 1014**:  Locatio Beginner's Guide, published August 30, 1999 and certified English translation thereof

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

**Exhibit 1015**:  May 28, 2004 Office Action in U.S. Patent App. No. 09/833,969

**Exhibit 1016**:  December 9, 2004 Office Action in U.S. Patent App. No.
09/833,969

**Exhibit 1017**:  March 31, 2006 Response to Office Action in U.S. Patent App.
No. 09/833,969

**Exhibit 1018**:  July 5, 2006 Final Office Action in U.S. Patent App. No.
09/833,969

**Exhibit 1019**:  July 16, 2007 Response to Office Action in U.S. Patent App. No.
09/833,969

**Exhibit 1020**:  October 16, 2007 Notice of Allowability in U.S. Patent App. No.
09/833,969

**Exhibit 1021**:  Claim Limitation Table for U.S. Patent No. 7,343,165, showing
claim limitation labels

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

# Table of Authorities

## Cases

*In re Swanson*, 540 F.3d 1368, 1377-78 (Fed. Cir. 2008) .......................................7

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).............................................. 51

*Silver State Intellectual Technologies, Inc. v. Foursquare Labs, Inc.*, No.
   2:12-cv-01308 (D. Nev. July 25, 2012)................................................................1

*Star Scientific, Inc. v. RJ Reynolds Tobacco Co.*, 655 F. 3d 1364, 1372
   (Fed. Cir. 2011) .............................................................................................. 12

## Statutes

35 U.S.C § 102(e)(2) (pre-AIA) ........................................................ 4, 14, 25, 33

35 U.S.C. § 102(a) (pre-AIA)..................................................................... 4, 43, 51

35 U.S.C. § 102(b) (pre-AIA) .............................................................................. 32

35 U.S.C. § 103(a) (pre-AIA)..................................................................................4

35 U.S.C. § 112 .................................................................................................. 12

35 U.S.C. § 312(a)(1) ...........................................................................................3

35 U.S.C. §§ 311-319 ...........................................................................................1

## Rules

37 C.F.R. § 42.8(a)(1).........................................................................................1

35 U.S.C. § 314(a) ...............................................................................................5

37 C.F.R, § 42.10(b). ...........................................................................................2

37 C.F.R. § 42.100(b) ...........................................................................................7

37 C.F.R. § 42.103 ...............................................................................................3

37 C.F.R. § 42.104 ........................................................................................... 3, 7

37 C.F.R. § 42.15(a)(1).........................................................................................3

37 C.F.R. § 42.8(b) ...............................................................................................1

37 C.F.R. 42.108.............................................................................................. 3, 5

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

Petitioner Foursquare Labs, Inc. ("Petitioner" or "Foursquare") respectfully petitions for *inter partes* review under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of claims 2-5 and 7-9 of U.S. Patent No. 7,343,165 (Ex. 1001) ("the '165 Patent").

# I.     MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(a)(1)

## A.     Real Party-in-interest under 37 C.F.R. § 42.8(b)(1)

Petitioner, Foursquare Labs, Inc. is the real party-in-interest.

## B.     Related Matters under 37 C.F.R. § 42.8(b)(2)

The '165 Patent is the subject of litigation styled *Silver State Intellectual Technologies, Inc. v. Foursquare Labs, Inc.*, No. 2:12-cv-01308, pending in the U.S. District Court for the District of Nevada ("the Nevada Action"). The patent owner, Silver State Intellectual Technologies, Inc. ("Silver State"), is a non-practicing entity. Silver State originally filed a complaint for patent infringement against Foursquare on July 25, 2012. *See* Ex. 1009. Foursquare agreed to service of process and a signed waiver form was filed by Silver State on November 16, 2012. *See* Ex. 1010. The patent owner alleges that Foursquare infringes claims of the '165 Patent. Foursquare denies that it infringes and asserts that the patent is invalid.

## C.     Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Craig R. Smith (Reg. No. 45,113)<br>LANDO & ANASTASI LLP<br>One Main Street<br>Cambridge, MA  02142<br>Main:  (617) 395-7081<br>Fax: (617) 395-7070<br>csmith@lalaw.com | William J. Seymour (Reg. No. 64,990)<br>LANDO & ANASTASI LLP<br>One Main Street<br>Cambridge, MA  02142<br>Main:  (617) 395-7063<br>Fax: (617) 395-7070<br>wseymour@lalaw.com |

### D.      Service Information

The Petition is being served by electronic mail, as agreed by the parties, to

the attorney of record for the '165 Patent, Daniel M. Cavanagh, Klein, O'Neill &

Singh, LLP, 18200 Von Karman Ave., Suite 725, Irvine CA 92612

(dacavanagh@koslaw.com).  A courtesy copy of the petition is also being served

by electronic mail on the counsel of record for Silver State in the Nevada action,

Frederick S. Berretta, at Knobbe, Martens, Olson & Baer, LLP, 12790 El Camino

Real, San Diego, CA 92130 (Fred.Berretta@knobbe.com).

Foursquare may be served at the address provided immediately above in

Section I.C for Lead and Back-Up Counsel.  The Petitioner also consents to

electronic service by e-mail at the e-mail addresses provided above for Lead and

Back-Up Counsel.

### E.      Power of Attorney

Filed concurrently with this petition in accordance with 37 C.F.R, §

42.10(b).

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

## II.    PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of eight claims of the '165 Patent and is accompanied by a payment of $9,000.  37 C.F.R. § 42.15(a)(1).  No excess claim fees are required.  This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

## III.   REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.    Grounds for Standing under 37 C.F.R. § 42.104(a)

The '165 Patent is eligible for *inter partes* review.  Petitioner certifies that it is not barred or otherwise estopped from requesting *inter partes* review challenging the identified claims on the grounds identified within the present petition.

### B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

The Petitioner respectfully requests that the Board initiate *inter partes* review of claims 1-5 and 7-9 of the '165 patent, and requests that the Board find each of these claims unpatentable.  The grounds set forth in this Petition rely on the following five prior art references:

- U.S. Patent No. 6,587,691 to Bo Granstam, et al. ("Granstam")
- U.S. Patent No. 6,549,768 to Federico Fraccaroli ("Fraccaroli")
- U.S. Patent No. 5,835,907 to Brian Newman ("Newman")
- Japanese Patent Pub. No. 2000-322446 to Ushayama Kenichi ("Kenichi")

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

- Japanese Patent Pub. No. 2000-275319 ("Makoto")

Each of the references listed above qualifies as prior art to the '165 Patent.

Granstam, Fraccaroli, and Newman qualify as prior art at least under 35 U.S.C §

102(e)(2) (pre-AIA) because they are patents that issued from applications filed in

the United States prior to the earliest application to which the '165 Patent could

claim priority.

Kenichi and Makoto qualify as prior art to the '165 Patent under 35 U.S.C. §

102(a)(pre-AIA) because that are patent applications that published prior to the

non-provisional application date of the '165 Patent. As explained in Part VI,

below, the '165 Patent is not entitled to the priority date of its provisional

application.

The grounds on which this Petition is based are listed in the table below.

| Ground | Claims | Basis for Invalidity |
|---|---|---|
| 1 | 1 | Anticipated by Granstam under 35 U.S.C. §102(e)(2) |
| 2 | 2-5 & 7-9 | Anticipated by Granstam under 35 U.S.C. §102(e)(2) |
| 3 | 1 | Anticipated by Fraccaroli under 35 U.S.C. §102(e)(2) |
| 4 | 1 | Obvious over Newman in view of Granstam under 35 U.S.C. § 103(a) |
| 5 | 1 | Anticipated by Kenichi under 35 U.S.C. § 102(a) |
| 6 | 2-5 & 7-9 | Obvious over Kenichi in view of Makoto under 35 U.S.C. § 103(a) |

A detailed explanation of why each claim is unpatentable under the statutory

grounds identified above is provided in Part VII below.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### C.    Requirements for Inter Partes Review 37 C.F.R. § 42.108(c)

*Inter partes* review of claims 1-5 and 7-9 should be instituted because this Petition establishes a reasonable likelihood that Foursquare will prevail with respect to at least one of the claims challenged.  *See* 35 U.S.C. § 314(a).  Each limitation of the challenged claims is disclosed or suggested by the prior art references discussed herein.  Where appropriate, this Petition identifies reasons to combine the references.

## IV.    DESCRIPTION OF THE CHALLENGED CLAIMS

The '165 Patent, entitled "GPS Publication Application Server," purports to describe a system and method of tracking a mobile device user's location and providing location-relevant information.  *See* the '165 Patent at col. 1, ll.13-15 ("The present invention relates generally to user mobile information systems, and more specifically to location identifiable user mobile communication systems."). The application that became the '165 Patent was filed on April 11, 2001. For nearly eight years, the applicant negotiated with the United States Patent and Trademark Office ("PTO") to try to get its claims allowed. The patent Examiner rejected the claims many times. *See, e.g.* Ex. 1015; Ex. 1016 (rejecting the claims a second time as anticipated and/or obvious in light of U.S. Patent No. 6,377,810 ("Geiger") and further in view of U.S. Patent Pub. No. US 2002/0068551 ("Strunk")). The Examiner explained that "Geiger teaches a method of providing

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

contact information regarding a user, the method comprising: allocating a user specific space in memory 21 accessible over a computer network 22 to a specific user 15-17 (figs. 1, 4 ) ...” *See id.* at 4.

On March 31, 2006, the applicant again amended the claims, further limiting the claims requiring that the access list of possible requesters be received from the individual associated with the Personal Communication Device. *See* Ex. 1017. However, the Examiner again found this additional limitation anticipated and/or obvious over Geiger in view of Strunk, and further in view of U.S. Patent No. 6,360,102 (Havinis), which disclosed an access list. *See* Ex. 1018.

On July 16, 2007, the applicant argued that Strunk and Havinis do “not teach or suggest receiving, from the user, additional data regarding the user … ***the additional data being related to a geographic location of the user***…” Ex. 1019 at 9 (emphasis added). On October 16, 2007, the Examiner allowed the claims of the application after a telephone interview with the applicant on September 17, 2007. *See* Ex. 1020 at 2. No summary of the September 17, 2007, telephone interview appears in the prosecution history.

Claims 1 and 2 of the ‘165 Patent are both independent claims. Claim 1 is a method claim whereas claim 2 covers a “location relevant server system.” There is significant overlap between claims 1 and 2. Claims 3-5 and 7-9 depend from independent claim 2. There are no claims depending from independent claim 1.

6

For the convenience of the Board, the limitations of claims 1-5 and 7-9 have been broken up and separately labeled (e.g., [1a], [2a], etc.) to facilitate easier comparison between the claim limitations and the prior art discussed in Part VII, below. A full listing of the separately labeled claim limitation can be found in Ex. 1021. As explained in Part VII, below, all limitations of claims 1-5 and 7-9 are disclosed or suggested by the prior art cited in this Petition.

## V.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

### A.    Legal Overview

A claim subject to *inter partes* review must be given its "broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b). The claim terms from the challenged claims that would benefit from claim construction by the Board are identified below. For all other claim terms, the Petitioner has applied the broadest reasonable construction based on the plain and ordinary meaning to one of ordinary skill in the art at the time of invention.

As the Federal Circuit has recognized, the "broadest reasonable construction" standard is fundamentally different from the manner in which the scope of a claim is determined in litigation. *See In re Swanson*, 540 F.3d 1368, 1377-78 (Fed. Cir. 2008). By identifying the broadest reasonable construction for certain terms in the challenged claims below, therefore, the Petitioner is not

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

admitting to the correctness or reasonableness of any particular interpretation for

purposes of litigation, or any other purpose.

## B. "User-Specific Space in Memory" and "User Specific Data Space"

Claim 1 requires a "user-specific space in memory" and claim 2 requires a

"user specific data space." Foursquare proposes the same construction for both

terms because they are nearly identical. Foursquare submits that the broadest

reasonable interpretation is "a space in computer memory that contains information

regarding a particular user." This construction is supported by the specification,

which describes the user-specific space as a user home page or database. *See* Ex.

1001 at col. 2, ll. 16-20 ("the users personal home page location, or user-specific

storage space allows the user to populate their own database and communicate

certain information from that database to other users that were enabled to receive

the populated information."). In the Nevada Action, Silver State contends that the

"user-specific space in memory" need not be a database or any other particular data

structure. *See* Ex. 1011 at 7.

## C. "Accessible Over a Computer Network to a Specific User"

Claim 1 of the '165 Patent requires that the user-specific space in memory

be "accessible over a computer network to a specific user." Foursquare submits

that the broadest reasonable interpretation is "users can cause information to be

read from or written to their user-specific space." The '165 Patent states that both

8

the owner of the user-specific space and the owner's invitees can "access" the user-specific space. *See, e.g.,* Ex. 1001 at col. 4, ll. 52-54 ("The user may also provide varying levels of access to data in the user-specific space, or the e-card, to both persons known and unknown to the user."). Yet, only the owner of the user-specific space is described as having the ability to write data to the user specific space. *See, e.g., id*. at claim 2 ("the application server is further configured to store information received from and concerning an individual associated with the PCD in the user specific data space."). Therefore, "access" must be understood to encompass both an ability to read or write data within the user-specific space. In the Nevada Action, Silver State contends that the term "accessible" does ***not*** require that the user be able to "review, edit, obtain, add and delete any and all information in the user-specific database." *See* Ex. 1011 at 7-8.

**D.** **"Additional Data Regarding the User, the Additional Data Being Related to the Geographic Location of the User" and "Additional Information Related to the Geographic Location of the Individual"**

Claim 1 requires the user to provide "additional data regarding the user, the additional data being related to the geographical location of the user" and claim 2 requires "additional information related to the geographic location of the individual." Due to the similarity in claim language, Foursquare proposes the same construction for both terms. Foursquare submits that the broadest reasonable

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

interpretation is "information regarding the user and the geographic location of the user." The specification indicates that additional information may include "personalized information regarding points of interest and other matters provided by users of PCDs." Ex. 1001 at col. 3, ll. 32-33. In the Nevada Action, Silver State contends that the "additional data regarding the user" need not be limited to contact information, but may broadly encompass "[o]ther data regarding the user (and related to the geographical location of the user)." Ex. 1011 at 11.

### E. "Receiving from the User an Access List of Possible Requesters" and "the Access List Being Received From the Individual Associated with the PCD"

Claims 1 and 2 of the '165 Patent both require that an "access list" be received from the user. Due to the similarity in claim language, Foursquare proposes the same construction for both terms. Foursquare submits that the broadest reasonable interpretation is "information provided by the user defining varying levels of access to data in the user-specific space, to both persons known and unknown to the user." *See* Ex. 1001 at col. 4, ll. 52-54. In the Nevada Action, Silver State argued that an "access list" need not be a discrete list, but may include simply "providing varying levels of access to data in the user-specific space, to both persons known and unknown to the user." *See* Ex. 1011 at 13. Notably, because the broadest reasonable interpretation of an access list includes providing access to persons "unknown to the user," this claim limitation also encompasses

using access criteria as opposed to identifying specific persons granted access.

### F.    "GPS Server"

Claim 2 of the '165 Patent requires a "a GPS server receiving information indicating a geographic location and a unique identifier associated with the PCD, the GPS server providing the PCD location and the unique identifier associated with the PCD to an application server."  Foursquare submits that the broadest reasonable interpretation of "GPS server" is "a computer that is configured to receive and/or provide location information."  This is consistent with the specification, which states that "[t]he PCD also provides the wireless GPS server information over the communication link, including information relating to the location of the PCD."  Ex. 1001 at col. 3, ll. 45-47.  Furthermore, "[t]he GPS server provides the PCD location and identifier to an application server 15. The application server is provided the information from the GPS server via the Internet, or in some cases an intranet."  Ex. 1001 at col. 3, l. 64 – col. 4, l. 1.  In the Nevada Action, Silver State construed the term "GPS Server" as "a computer that is configured to receive and/or provide location information."  Ex. 1011 at 15-16.

## VI.    THE '165 PATENT IS NOT ENTITLED TO THE PRIORITY DATE OF ITS PROVISIONAL APPLICATION

As an initial matter, the '165 Patent is not entitled to the priority date of the provisional patent application to which it claims benefit because the provisional patent application does not contain any written description for at least "associating

a mobile communications device with the user," as required in claim 1, or an "individual associated with a PCD," as required in claim 2. *See Star Scientific, Inc. v. RJ Reynolds Tobacco Co.*, 655 F. 3d 1364, 1372 (Fed. Cir. 2011) ("Claims deserve the provisional application's earlier filing date so long as that application contains adequate written description under 35 U.S.C. § 112.") (citation omitted).

The Provisional Application discusses techniques for identifying a PCD or mobile communication device, but it never discusses how those devices are then "associated with the user." *See* Ex. 1013. In fact, the Provisional Application does not include the words "associating," "associate," "associated," or any other derivation of "associate." The Provisional Application states that "the PCD provides a wireless GPS server with the present location and ***an identifying tag indicating the identity of the PCD***. The GPS server provides the PCD location and identifier to an application server 15." *Id.* at 6, ll. 19-22 (emphasis added). However, this passage does not associate the PCD with an end user and nothing in the Provisional Application mentions an association or describes how such an association is made.

In the Nevada Action, Silver State argued that the step of "associating a mobile communications device with the user," had written description support within the '165 Patent simply because the phrase "associating a mobile communication device with the user," was included in ***the originally-filed claims***

12

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

*in the non-provisional application* that later became the '165 Patent. *See* Ex. 1012. Based on Silver State's own reasoning, there is no written description because the provisional patent application did not include *any* claims. Silver State cannot properly claim priority to the Provisional Application because it has no written description for "associating a mobile communications device with the user," or "individual associated with a PCD."

Therefore, for purposes of this petition, the earliest priority date that may be applied to claims 1-5 and 7-9 of the '165 Patent is April 11, 2001, the date that the non-provisional patent application was filed. As a result, the references Kanichi and Makoto constitute prior art because each of these references was published prior to April 11, 2001. All other references relied upon in this petition are prior art regardless of whether the '165 Patent may properly claim the benefit of the Provisional Application date.

## VII. CLAIMS 1-5 AND 7-9 OF THE '165 PATENT ARE INVALID

### A. GROUND 1 – Claims 1 is Anticipated by Granstam

U.S. Patent No. 6,587,691 to B. Granstam, et al. ("Granstam"), titled "Method and Arrangement Relating to Mobile Telephone Communications Network," discloses a mobile communications network that includes mobile stations (or phones) along with a means for determining their position. Ex. 1002 at Abstract. The positioning means may consist of GSM, GPS, or other known

techniques. *Id.* at col. 3, l. 65 – col. 4, l. 7. Granstam also discloses an arrangement for storing position data, processing such data, and providing such data to a second mobile station seeking location information relating to a first mobile station. Ex. 1002 at Abstract. Granstam also discloses a "Buddy-list" feature that allows users to decide which other users of the mobile communications network will be provided with their location and status information. Figure 6 of Granstam shows that users can view location and status information regarding other mobile stations on their buddy list.



Granstam issued from an application filed in the United States on February 25, 2000, and therefore, qualifies as prior art under at least 35 U.S.C. § 102(e)(2).

### a)    Granstam Discloses Limitation 1[a]

Granstam discloses the preamble of claim 1. For example, Granstam states that one of the objectives of the invention is to provide contact information in the form of an "address," "intelligent address book," "email addresses," "visiting card," or home page. *Id.* at col. 2, l. 64 - col. 3, l. 10; col. 10, ll. 7-18.

### b)    Granstam Discloses Limitation 1[b]

With regard to limitation 1[b], Granstam discloses a user specific space that

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

is accessible over a computer network in the form of an "Information Database," or
"IDB."

> The IDB contains extended information about the subscribers
> preferably as a result of subscribing to the extended services provided
> by the network or the network operator. The IDB may include
> information on the subscribers interests, age, friends and relations,
> medical information (e.g. through online monitoring of a subscriber)
> on subscribers, status of MS, MS's position etc.

*Id*. at col. 7, ll. 9-16. Granstam also describes the IDB as being accessible to a
specific user, stating that "It is also possible to establish connection with other
networks 19, such as Internet, Intranet etc., to access the IDB through an
appropriate gateway (not shown) for retrieving or delivering data." *Id*. at col. 5, ll.
61-65.

### c) Granstam Discloses Limitation 1[c]

With regard to limitation 1[c], Granstam associates mobile communication
devices with users through the use of information stored on the SIM card for the
mobile communication device. In Granstam, mobile communication devices are
referred to as Mobile Stations ("MS"). Ex. 1002 at col. 6, ll. 2-3 ("The Mobile
Station (MS) 17 is carried by the subscriber."). Each "MS consists of the Mobile
Unit 21 (the terminal) and a Subscriber Identity Module (SIM) 25." *Id*. at col. 6, ll.
19-20. "[S]tored in the SIM card are: an International Mobile Subscriber Identity

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

(IMST) used to identify the subscriber to the system." *Id*. at col. 6, ll. 32-34.

### d) Granstam Discloses Limitation 1[d]

With regard to limitation 1[d], Granstam discloses several ways that the mobile communication device (Mobile Stations) can determine its location, including "Global Positioning Systems (GPS)" *Id*. at col. 7, ll. 25-43.  Granstam describes determining the Mobile Station's location through "the resources of the GSM network, locating the connecting base station, the signal strength measurement, time advanced measurement and/or triangulation (if MS reached from several cells or BSs) are used to locate a MS."  *Id*. at col. 7, ll. 31-35.

### e) Granstam Discloses Limitation 1[e]

With regard to limitation 1[e], Granstam states that the Information Database (IDB) includes information indicating the location of the user's Mobile Station. Granstam states that "[t]he IDB may include information on the… MS's position" *Id*. at col. 7, ll. 12-16.  Claim 3 of Granstam claims a data storage arrangement that "stores position data associated with said first mobile station."  *Id*. at col. 11, ll. 3-5 (claim 3).

### f) Granstam Discloses Limitation 1[f]

With regard to limitation 1[f], the Information Database (IDB) of Granstam is described as receiving and containing information relating to the user of the Mobile Station.  "The IDB may include information on the subscribers interests,

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

age, friends and relations, medical information (e.g. through online monitoring of a

subscriber) on subscribers, status of MS, MS's position etc." Ex. 1002 at col. 7, ll.

12-16. Granstam states that "[t]he status information substantially includes

information on busy/idle, connected/disconnected, technical problems (the battery

status, malfunctions etc.) of the mobile unit." *Id*. at col. 7, ll. 16-19. Granstam

also explains that this status information is received from the user, as required in

the claims. *See id*. at col. 7, ll. 19-20 ("Obviously, all or some amount of

information can be stored by the permission of the subscriber.").

The "additional information" received from the Mobile Station user relates

to the geographic location of the user. Granstam explains that the IDB contains

both public and private information of the MS user. "Public data may include Nick

Names, MSISDN, Icons (Sound/Text/Picture),

Location, **Location Status**, Phone Status, Email

Address, ICQ No., greetings, personal data such

as name, work, education, references, sex,

interest, age, length, weight, hair/eye colour,

address, work details, home page, community,

user-defined-items, for example part of visiting

card, etc." *Id*. at col. 10, ll. 12-17 (emphasis

added). An example of "location status" is found in Figure 5 of Granstam, which



*FIG. 5*

discloses "Do Not Disturb" and "Busy" options that are selectable by the user. *See* Fig. 5, above.

### g) Granstam Discloses Limitation 1[g]

With regard to limitation 1[g], Granstam states that "[t]he IDB may include information on the subscribers interests, age, friends and relations, medical information … on subscribers, status of MS, MS's position etc." Ex. 1002 at col. 7, ll. 12-16. Therefore, the IDB is a user specific space that stores additional data regarding the user.

### h) Granstam Discloses Limitation 1[h]

With regard to limitation 1[h] Granstam discloses using a "Buddy-list" to grant other MS users access to the subscriber's location information and public profile information.

> [T]he IDB 16 contains a list for each subscriber (prepared, e.g., by CA 27), a so-called 'Buddy-list'. Each Buddy-list contains selected information on the subscribers being selected as members of a particular subscriber's (client's) buddy-list (obviously, with permission of the subscriber and in view of the information provided by the subscribers).

*Id*. at col. 8, ll. 32-38. Granstam also states that MS users are notified "if other subscribers have added a user to his/her buddy list and possibility [sic] to Accept or Reject the insertion." *Id*. at col. 9, ll. 62-64.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### i) Granstam Discloses Limitation 1[i]

With regard to limitation 1[i], Granstam states that the Buddy-list information is stored in the Information Database. "[T]he IDB 16 contains a list for each subscriber (prepared, e.g., by CA 27), a so-called 'Buddy-list'. Each Buddy-list contains selected information on the subscribers being selected as members of a particular subscriber's (client's) buddy-list…" *Id.* at col. 8, ll. 32-36.

### j) Granstam Discloses Limitation 1[j]

With regard to limitation 1[j], Figs. 5 and 6 of Granstam (shown above) depict a Mobile Station displaying a Buddy locator application. This application shows the location of MS users on the subscriber's Buddy-list and additional "location status" information relating to the remote MS user. Indeed, Granstam states that providing location and location status information is one of the objectives of the patent.

> Another objective of the present invention is to provide the subscribers of the mobile communications network with structured information on other, preferably selected, subscribers of the same or other mobile communications networks. Preferably, the information comprises further data about the position or location of a mobile station (subscriber) and its status."

Ex. 1002 at col. 2, l. 64 – col. 3, l. 3.

19

### B.     GROUND 2 – Claims 2-5 and 7-9 Are Anticipated by Granstam

Granstam also discloses all of the limitations of claim 2 and dependent claims 3-5 and 7-9.

#### a)     Granstam Discloses Limitation 2[a]

With regard to the preamble of claim 2, Granstam explains that the invention relates to a location-relevant server architecture within a mobile communications network. *Id*. at col. 3, ll. 16-21; *see also* Fig. 1 (showing a location-relevant server architecture).

#### b)     Granstam Discloses Limitation 2[b]

Regarding limitation 2[b], Granstam discloses that "[t]he Mobile Stations 17 themselves may also be provided with positioning arrangements (e.g. GPS receivers) and communicate their positions to the MSC [Mobile Services Switching Center]." *Id*. at col. 7, lines 41-43. Fig. 2 also shows a Mobile Station 17 configured to communicate wirelessly within the GSM network 20.

#### c)     Granstam Discloses Limitation 2[c]

Granstam also discloses limitation 2[c]. Granstam discloses a server architecture whereby location information is first passed to a Visiting Location Register (VLR) and/or a Home Location Register (HLR) before the location information is passed to the information database.

The location updating procedures, and subsequent call routing, use the

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> MSC [Mobile Services Switching Center] and location registers: the
> HLR and the VLR. When a mobile station is switched on in a new
> location area, or it moves to a new location area or different operator's
> Public Land Mobile Network (PLMN), it must register with the
> network to indicate its current location. In the normal case, a location
> update message is sent to the new MSC/VLR, which records the
> location area information and then sends the location information to
> the subscriber's HLR, which may then pass the information to IDB or
> propagate it to other networks to update IDBs if provided with this
> functionality.

Ex. 1002 at col. 7, ll. 50-61. Thus, in the embodiment wherein the Mobile Station

constitutes a GPS receiver, *see* Part VII(B)(b), *supra*, the HLR would receive the

location information in the form of GPS coordinates and forward that information

to the IDB in order for it to be stored in the user-specific space. *See id*. During the

location update process, Granstam states:

> Authentication is carried out by means of the SIM card and by means
> of the AuC 13.4. Each subscriber is given a secret key, one copy of
> which is stored in the SIM card and the other in the AuC. The
> authentication is carried out in a manner well known for a skilled
> person and not detailed here.

*Id*. at col. 8, ll. 20-25.

### d) Granstam Discloses Limitation 2[d]

Regarding limitation 2[d], Granstam discloses "a Controlling Arrangement

(CA) 27" that is responsible for updating and maintaining the information in the Information Database IDB 16. *See Id.* at col. 7, ll. 7-24. The CA 27 also prepares the Buddy-list information that is then stored in the IDB. *See Id.* at col. 8, ll. 31-35 ("the IDE 16 contains a list for each subscriber (prepared, e.g., by CA 27), a so-called 'Buddylist'"). The CA is also described as being part of the server architecture: "[a]lthough, the IDB 16 is described and illustrated as an external database, it may be implemented as part of HLR or VLR and the CA 27 can be integrated in MSC." Ex. 1002 at col. 9, ll. 4-6.

### e) Granstam Discloses Limitation 2[e]

Granstam also discloses limitation 2[e]. As stated in Part VII(B)(d), *supra*, the Controlling Arrangement 27 updates information within the Information Database (IDB) and prepares the Buddy-list information that is then stored in the IDB. *See id.* at col. 8, ll. 31-36.

### f) Granstam Discloses Limitation 2[f]

Granstam also discloses limitation 2[f]. As stated in Part VII(A)(j), *supra*, Figs. 5 and 6 of Granstam depict Mobile Stations displaying a Buddy locator application. This application shows the location of MS users on the subscriber's Buddy-list and additional "location status" information relating to the remote MS user. *See id.* at col. 10, ll. 12-18. Indeed, Granstam states that providing location and location status information is one of the objectives of the patent. *See id.* at col.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

2, l. 64 – col. 3, l. 3.

g) **Granstam Discloses Limitation 3[a]**

Granstam also discloses dependent claim 3. As stated in Part VII(A)(j), Figs. 5 and 6 of Granstam depict Mobile Stations displaying a Buddy locator application. The figures show the location of MS users on the subscriber's Buddy-list and additional "location status" information relating to the remote MS user. Indeed, Granstam states that providing location and location status information is one of the objectives of the patent. *See id.* at col. 2, l. 64 – col. 3, l. 3.

h) **Granstam Discloses Limitation 4[a]**

Granstam also discloses dependent claim 4. As stated in Part VII(B)(d), *supra*, Granstam discloses "a Controlling Arrangement (CA) 27," that is responsible for updating and maintaining the information in the Information Database IDB 16. *See id*. at col. 7, ll. 8-24. The CA 27 also prepares the Buddy-list information that is then stored in the IDB. *See id*. at col. 8, ll. 32-34. The CA is also described as being part of the server architecture of Granstam, which is "a server-based solution for GSM operators." Ex. 1002 at col. 3, ll. 16-17.

i) **Granstam Discloses Limitation 5[a]**

With regard to dependent claim 5, Granstam states that the Information Database (IDB) includes both public and private information relating the user of the Mobile Station (MS). This public information includes contact information.

23

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

*Id*. at col. 10, ll. 12-18.

### j)     Granstam Discloses Limitation 7[a]

Granstam discloses dependent claim 7. As stated in Part VII(B)(b), *supra*, the Controlling Arrangement 27 updates information within the Information Database (IDB) and prepares the Buddy-list information that is then stored in the IDB. *See id*. at col. 8, ll. 32-34. The Buddy-list contained in the IDB determines each user's level of access to another user's public profile. *See id*. at col. 10, ll. 25-27 ("The user can control: the settings, which show the location, which show the telephone status, other application settings, terminal type, and other public and non-public data as a buddy.").

### k)     Granstam Discloses Limitation 8[a]

Granstam discloses dependent claim 8. As stated in Part VII(B)(c), with regard to the location update process of Granstam:

> Authentication is carried out by means of the SIM card and by means of the AuC 13.4. Each subscriber is given a secret key, one copy of which is stored in the SIM card and the other in the AuC. The authentication is carried out in a manner well known for a skilled person and not detailed here.

*Id*. at col. 8, ll. 20-25. Thus, Granstam discloses sending PCD locations and identifiers to the application server.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### l)   Granstam Discloses Limitation 9[a]

Dependent claim 9 is virtually identical to limitation 5[a] and is therefore anticipated by Granstam for the reasons stated in Part VII(B)(i).

### C.   GROUND 3 – Claim 1 is Anticipated by Fraccaroli

U.S. Patent No. 6,549,768 to Federico Fraccaroli ("Fraccaroli") is titled "Mobile Communications Matching System," and discloses a wireless communications network comprising:

> a server in a central location storing matching profiles for a plurality of users of the network. The matching profile for each user is stored in the server through the user's mobile unit or a secure page on the Internet. Each matching profile is corresponded with a respective mobile unit using the same identification information (ID) of the respective mobile unit utilized for carrying out phone calls.

Ex. 1003 at Abstract. Fraccaroli determines the location of the users within the network, stores the location information in their user profile at the central server, and then runs a matching algorithm to determine whether any users with common interests are in the same vicinity. *Id*. at col. 5, ll. 19-37. If there is a match, a message is sent to both users, indicating each other's location and the conditions of the match criteria, such as location-relevant information within the user's profile. *Id*. at col. 8, ll. 35-56. Fraccaroli issued from an application filed in the United States on August 24, 1999, and therefore qualifies as prior art under at least 35

25

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

U.S.C. § 102(e)(2).

### a)      Fraccaroli Discloses Limitation 1[a]

Fraccaroli discloses the preamble of claim 1. *Id*. at Abstract.

### b)      Fraccaroli Discloses Limitation 1[b]

With regard to limitation 1[b], Fraccaroli discloses a cellular network wherein "each HLR [Home Location Register] 105 has a server 106 with a matching engine 107. … Each server 106 receives and stores matching profiles for each USER ID corresponding to an active mobile station in service area 103." Ex. 1003 at col. 5, ll. 26-33.

> [E]ach corresponding HLR 105 of the cellular radio network knows the location of each active mobile radio station within an accuracy of an area consisting of one cell, this area generally being called a location area. This cell and cell group are provided to server 106 for each mobile station and is stored in the matching profile for the corresponding USER ID.

*Id*. at col. 5, ll. 19-25.  Fraccaroli also discloses that the user-specific space (the matching profile) is accessible over a computer network.  For example:

> A user's interaction with their respective profile and related information in the form of a secure internet page is supported by their handset. The handset having integrated browsing capabilities or by a separate browser such as Internet Explorer or Netscape Navigator to be accessed through a secure page by any personal computer with access to the secure internet page.

26

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

*Id*. at col. 8, ll. 48-54.

### c) Fraccaroli Discloses Limitation 1[c]

With regard to limitation 1[c], Fraccaroli states that "[e]ach server 106 receives and stores matching profiles for each USER ID corresponding to an active mobile station in service area 103." *Id*. at col. 5, ll. 30-32. When Fraccaroli determines the position of the mobile communication device, "location information so obtained is associated with the USER ID" and "is then transferred to HLR 105, provided to server 106 for each mobile station and stored in the data profile for the corresponding USER ID." *Id*. at col. 6, l. 65 – col. 7, l. 8. The matching profile may also include the user's name. *See id*. at col. 8, ll. 44-47 ("The matching profile may range from very generic common interests to the specific identity of known persons. This identity information may or may not include the USER ID corresponding to the user that is utilized in the cellular network.").

### d) Fraccaroli Discloses Limitation 1[d]

With regard to limitation 1[d], Fraccaroli discloses determining geographic location through a variety of means, including having the handset determine its location.

> Although numerous implementations of location capability in the handset are possible, the location implementation is preferably autonomous so that the handset itself can ask for its location or the location of the handset can be requested by a base station and supplied

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> by the handset in response to the request. In any event, the location
> information so obtained is associated with the USER ID and can be
> automatically sent to the base station during handset registration or
> whenever the USER ID information is sent to the base station.
> Alternatively, the location information can be delivered to the base
> station when it is requested irrespective of handset registration or
> transmission of the USER ID.

Ex. 1003 at col. 6, l. 60 – col. 7, l. 4. In the preferred embodiment of Fraccaroli,

the handset determines its location using GPS.

> Preferably, the handset used in a mobile-based positioning method
> embodiment of the invention is a combination of GPS and
> trilateration…. The handset operates in a dual mode system in which
> GPS is normally used and trilateration … is used instead if GPS is not
> available with full accuracy because, for example, the handset is
> inside a building.

*Id.* at col. 8, ll. 14-22.

### e)  Fraccaroli Discloses Limitation 1[e]

With regard to limitation 1[e], Fraccaroli discloses that:

> the location information so obtained is associated with the USER ID
> and can be automatically sent to the base station during handset
> registration or whenever the USER ID information is sent to the base
> station. Alternatively, the location information can be delivered to the
> base station when it is requested irrespective of handset registration or
> transmission of the USER ID. In the exemplary embodiment shown

28

> in FIG. 1, the location information is then transferred to HLR 105,
> provided to server 106 for each mobile station and stored in the data
> profile for the corresponding USER ID.

Ex. 1003 at col. 6, l. 65 – col. 7, l. 8. Therefore, Fraccaroli stores data indicative of

the location of the user in the user-specific space.

### f)      Fraccaroli Discloses Limitation 1[f]

With regard to limitation 1[f], Fraccaroli states that users populate their own

matching profile through a secure web page.

> A user's interaction with their respective profile and related
> information in the form of a secure internet page is supported by their
> handset. The handset having integrated browsing capabilities or by a
> separate browser such as Internet Explorer or Netscape Navigator to
> be accessed through a secure page by any personal computer with
> access to the secure internet page.

*Id*. at col. 8, ll. 48-54.  Fraccaroli also explains that profile information can relate

to a specific geographic location.

> For example, the invention could be applied in the situation of a large
> number of people attending a convention or other large event at the
> same convention center or other meeting place. The matching profile
> 201 could have a simple field identifying the user as one of the
> persons attending the event. The matching system could be set up to
> identify those persons once they enter the location area surrounding
> the convention center so that they are 'matched' with the information
> center or registration desk of the convention who can in turn provide

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

assistance.

*Id*. at col. 8, l. 60 - col. 9, l. 2.

### g) Fraccaroli Discloses Limitation 1[g]

With regard to limitation 1[g], Fraccaroli states that "[t]he matching profile for each user is stored in the server through the user's mobile unit or a secure page on the Internet." *Id*. at Abstract.

### h) Fraccaroli Discloses Limitation 1[h]

With regard to limitation 1[h], Fraccaroli explains that matching criteria may contain, among other things, specific individuals with whom a user wishes to share profile information when they are in the same vicinity. "The matching profile may range from very generic common interests to the specific identity of known persons. This identity information may or may not include the USER ID corresponding to the user that is utilized in the cellular network." Ex. 1003 at col. 8, ll. 44-48. Moreover, the '165 Patent specifically states that "[t]he user may also provide varying levels of access to data in the user-specific space ... to both persons known and unknown to the user." Ex. 1001 at col. 4, ll. 52-54. In this way, the matching criteria within the matching profiles of Fraccaroli could also be considered an "access list," even when a specific individual is not identified because the matching criteria constitutes "information provided by the user defining varying levels of access to data in the user-specific space, to both persons

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

known and unknown to the user," as discussed in Part V(E).

### i) Fraccaroli Discloses Limitation 1[i]

With regard to limitation 1[i], the matching criteria of Fraccaroli is disclosed as being stored in the matching profile. Ex. 1003 at Abstract ("A wireless communications network comprises a server in a central location storing matching profiles for a plurality of users of the network.") This matching profile includes "the characteristics of the service subscriber such as business interests, personal interests, identity information of people whose proximity he wants to be aware of and put in contact with if close enough, etc." *Id*. at col. 8, ll. 35-39.

### j) Fraccaroli Discloses Limitation 1[j]

With regard to limitation 1[j], Fraccaroli discloses a "message signal" that is sent to users whenever the matching engine has determined a match within the vicinity.

> when a match is made in the matching engine, information identifying the two USER IDs matched is sent to home location register 105 and is then forwarded to VLR-msc 104 corresponding to the location area in which the mobile stations are located. … In a preferred embodiment, the message signal is a prompt instructing the user of the mobile station of the match and prompting them to initiate a phone call with the mobile station with which they have been matched. ***The prompt preferably includes some characteristics of the match occurred and, only if the users have agreed, the phone numbers of***

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> ***the persons being matched*** or other information by which a phone
> call can be initiated with the matched person without knowing their
> phone number. ***The prompt could also include the name of the user***
> ***of the other mobile station and/or information in the profile of the***
> ***user of the other mobile station***. In the case that a group of people
> already know each other, this information can be included in their
> matching profile and the user can be immediately informed and put in
> contact with any one of those people who happens to be in his
> matching area."

*Id*. at col. 10, ll. 40-67 (emphasis added). Therefore, Fraccaroli discloses a

message signal that provides data indicative of the location of the user and the

additional data regarding the user to possible requesters on an access list.

### D. GROUND 4 – Claim 1 is Obvious Over Newman in View of Granstam

U.S. Patent No. 5,835,907 to Brian Newman ("Newman") is titled

"Emergency PCS System for Identification and Notification of a Subscriber's

Location," and discloses a GPS-enabled emergency PCS device that periodically

monitors the position of a user. *See* Ex. 1004 at Abstract. This position

information is received at a wireless network and stored in a user-specific database.

The device can also send an emergency signal that is also stored in the database.

Emergency personnel and a pre-designated emergency contact can access the

database to view position and emergency information. *See id.* Newman was issued

as a patent on November 10, 1998 and therefore, qualifies as prior art under at least

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

35 U.S.C. § 102(b) (pre-AIA).

Newman discloses all of the limitations of claim 1 of the '165 Patent, with the possible exception of limitations 1[h]. However, this limitation is disclosed in Granstam. As discussed in Part VII(A), Granstam issued from an application filed in the United States on February 25, 2000, and therefore qualifies as prior art at least under 35 U.S.C. § 102(e)(2).

It would have been obvious to one of ordinary skill in the art to combine the disclosure of Newman with Granstam to further enable the former to include limitations 1[h]. Doing so would have constituted the combination of prior art elements according to known methods to yield predictable results, as well as the use of a known technique to improve known devices, methods or products in a predictable way. *See KSR*, 550 U.S. at 416-18. For example, Newman already suggests that emergency contacts are defined at the time the invention is implemented through something akin to an "access list." For example, Newman states that "[e]mergency services and/or a designated contact [are] initially selected by the subscriber at the time of purchase or leasing the emergency PCS device." Ex. 1004 at col. 5, ll. 51-53. It would have been obvious for one of skill in the art to employ the buddy list of Granstam as a means of selecting emergency services and designated contacts.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### a) Newman Discloses Limitation 1[a]

Newman discloses the preamble of claim 1. For example, Newman uses a GIS server, which "converts the location information represented by a latitude/longitude combination to a user-friendly classification of a block, street, city, etc." *Id.* at Abstract.

### b) Newman Discloses Limitation 1[b]

With regard to limitaiton 1[b], Newman describes a database wherein user location information is stored on a periodic basis. Newman states that "A wireless communication device, operating over frequencies allocated to Personal Communications Services (PCS), uses Global Positioning System (GPS) technology to determine the subscriber's exact location on a periodic

| | Before Activation *300* | After Activation *302* | Periodic Update *304* | Emergency Activation *306* |
|---|---|---|---|---|
| Time | 00:05 | 00:05 | 00:10 | 00:13 |
| WEPD ID | 123456 | 123456 | 123456 | 123456 |
| GPS Coordinates | none | 90˚ W Latitude, 30˚ N Longitude, 20', 33" | 90˚ W Latitude, 30˚ N Longitude, 20', 40" | 90˚ W Latitude, 30˚ N Longitude, 30', 60" |
| GIS Map Location | none | 111 Elm Street, New Orleans, Louisiana, USA | 130 Elm Street, New Orleans, Louisiana, USA | 220 Oak Street, New Orleans, Louisiana, USA |
| Stored Location | none | 111 Elm Street, New Orleans, Louisiana, USA | 130 Elm Street, New Orleans, Louisiana, USA | 220 Oak Street, New Orleans, Louisiana, USA |
| Emergency Indicator | none | OFF | OFF | OFF |

**FIG. 3**

basis. The device sends the location information to a database for storage and subsequent retrieval by a Geographical Information System (GIS) software application." *Id.* at Abstract. Figure 3 of Newman depicts a data table within the central database. The table is unique to a particular ID number associated with a

34

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

user.

The database of Newman is accessible over a network to a specific user. For example, "Customer or User Inquiry 128 occurs when an inquirer desires information about the device's location, provided he or she knows the ID of the emergency PCS device 100. Access may be through a personal computer, for example, linked to a database via a network." *Id.* at col. 6, ll. 8-12. Therefore, Newman discloses limitation 1[b].

### c) Newman Discloses Limitation 1[c]

With regard to limitation 1[c], Newman discloses using a unique identifier in connection with the emergency PCS device during the process of determining the location of the device.

> After receiving GPS Satellite Transmission 104 and determining the angular coordinates in terms of latitude and longitude, the emergency PCS device 100 must transmit those coordinates, as well as an emergency distress signal if applicable, to a database for storage and processing. Using Device Location Transmission 108, the emergency PCS device 100 accesses a PCS network over the wireless medium and, ***using its unique identification number or a code***, proceeds to log onto a computer. The computer … then sends the coordinates, and the emergency indicator if applicable, to an information resource, designated as GPS Location 110, which is a database being accessed by the computer.

*Id.* at col. 4, ll. 49-62 (emphasis added). As shown in Fig. 3, above, this Wireless

35

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

Emergency PCS Device ID ("WEPD ID") is recorded in the central database each
time that the emergency PCS device determines its location. *See also id.* at col. 7,
l. 64, col. 8, l. 1 ("As shown in column 300 [of Fig. 3], prior to its activation the
emergency PCS device 100 keeps only the current time and its assigned
identification number designated as WEPD (Wireless emergency PCS device) ID
in nonvolatile memory."). Because each subscriber is assigned a device containing
a unique WEPD ID and is tracked using this number, Newman discloses limitation
1[c].

### d)    Newman Discloses Limitation 1[d]

With regard to limitation 1[d], Newman discloses that the emergency PCS
device is GPS-enabled, and periodically sends location information to a networked
server.

> After receiving GPS Satellite Transmission 104 and determining the
> angular coordinates in terms of latitude and longitude, the emergency
> PCS device 100 must transmit those coordinates, as well as an
> emergency distress signal if applicable, to a database for storage and
> processing. Using Device Location Transmission 108, the emergency
> PCS device 100 accesses a PCS network over the wireless medium
> and, using its unique identification number or a code, proceeds to log
> onto a computer. The computer, which may be located on a computer
> network as known in the art, then sends the coordinates, and the
> emergency indicator if applicable, to an information resource,

36

> designated as GPS Location 110, which is a database being accessed
> by the computer.

*Id*. at col. 4, ll. 49-62. Therefore, Newman discloses limitation 1[d].

### e) Newman Discloses Limitation 1[e]

With regard to limitation 1[e], Newman states that after the emergency PCS device logs into the networked computer and sends the location information, "[t]he computer … then sends the coordinates, and the emergency indicator if applicable, to an information resource, designated as GPS Location 110, which is a database being accessed by the computer." *Id*. at col. 4, ll. 57-62. Furthermore, as shown in Fig. 3, above, the location information and unique WEPD ID are stored in a table within the database. As such, Newman discloses limitation 1[e].

### f) Newman Discloses Limitation 1[f]

Newman also discloses limitation 1[f]. In Newman, the additional data regarding the user and related to the geographic location of the user is the emergency signal sent by the user. Newman describes that the user is given the ability to press an emergency button, which automatically updates the central database and informs a designated emergency contact that the user is experiencing an emergency and the geographic location of that emergency.

> User Interface Device Location 116 receives the GIS-determined,
> user-friendly location information, and the emergency distress signal
> if applicable, and stores them to yet another information resource such

as Location Storage 118 which may be a database, for example. This information is stored in the database to enable an access by emergency services personnel or an interested party.

*Id*. at col. 5, ll. 31-37.

Based on the subscriber's selection, activation of the emergency distress button generates a signal for notifying emergency services, a designated contact, or both. This function provides a level of safety and reassurance to the subscriber and more specifically includes dialing or accessing the emergency services computer network automatically; relaying the location information of the emergency PCS device 100; if selected, dialing an emergency contact telephone number automatically; and relaying the location information of the emergency PCS device 100. If the emergency distress button has not been pressed on the emergency PCS device 100, no emergency distress signal is generated. No action is therefore taken concerning the emergency services and/or a designated contact.

*Id*. at col. 5, l. 55 – col. 6, l. 2. Because the emergency distress signal is information regarding the user and related to the geographic location of the user, Newman discloses limitation 1[f].

### g) Newman Discloses Limitation 1[g]

Newman also discloses limitation 1[g]. As can be seen in Fig. 3, above, the central database includes a field showing whether or not the Emergency Indicator has been turned on. Newman also explains that:

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> Interface Device Location 116 receives the GIS-determined, user-friendly location information, ***and the emergency distress signal if applicable, and stores them to yet another information resource such as Location Storage 118 which may be a database***, for example. ***This information is stored in the database*** to enable an access by emergency services personnel or an interested party.

*Id.* at col. 5, ll. 30-36. Therefore, the database stores the additional data regarding the user in the user space, and Newman discloses limitation 1[g].

### h) Newman Discloses Limitation 1[h] in view of Granstam

With regard to limitation 1[h], Newman discloses that the user of the emergency PCS device may select a designated emergency contact who can then access their location and location-related information. For example, "emergency services and/or a designated contact are automatically notified if an emergency distress signal has been activated by the subscriber. Alternatively, if the emergency distress signal has not been activated, a voice processing system provides on-demand information on the subscriber's location to a telephone caller who supplies the emergency PCS device's code." *Id.* at col. 2, ll. 40-47. Furthermore:

> In the event that the emergency distress signal has not been activated from the emergency PCS device 100, its location information must wait for an on-demand inquiry in step 226. This inquiry may be a mother who has given the emergency PCS device 100 to her daughter going to a playground, for example. The inquirer can access the location information stored in the database via a voice response

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

system or a computer link to the database.

*Id*. at col. 7, ll. 53-61.   Newman further discloses that, in the event that the emergency button is selected, "[e]mergency services and/or a designated contact, ***as initially selected by the subscriber at the time of purchase or leasing the emergency PCS device 100***, are notified via Notify Emergency Services or Designated Contact 124 for subsequent action."  *Id*. at col. 5, ll. 51-55.  Although an access list may be inferred from the foregoing disclosure, it does not expressly disclose the use of an access list.

However, as previously explained in Part VII(A)(h), Granstam discloses using a "Buddy-list" to grant other Mobile Station users access to the subscriber's location information and public profile information.

> [T]he IDB 16 contains a list for each subscriber (prepared, e.g., by CA 27), a so-called 'Buddy-list'. Each Buddy-list contains selected information on the subscribers being selected as members of a particular subscriber's (client's) buddy-list (obviously, with permission of the subscriber and in view of the information provided by the subscribers).

Ex. 1002 at col. 8, ll. 32-38.  Granstam also states that MS users are notified "if other subscribers have added a user to his/her buddy list and possibility [sic] to Accept or Reject the insertion."  *Id*. at col. 9, ll. 62-64.  Therefore, Granstam discloses limitation 1[h].

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### i) Newman Discloses Limitation 1[i], in View of Granstam

Newman also discloses limitation 1[i] in view of Granstam. Although Newman discloses that emergency contacts are "initially selected by the subscriber at the time of purchase or leasing the emergency PCS device 100," *see* Ex. 1004 at col. 5, ll. 52-53, it is unclear whether the emergency contact list is stored in the central database. However, as explained in Part VII(A)(h), Granstam states that the Buddy-list information is stored in the Information Database (IDB): "the IDB 16 contains a list for each subscriber (prepared, e.g., by CA 27), a so-called 'Buddy-list'. Each Buddy-list contains selected information on the subscribers being selected as members of a particular subscriber's (client's) buddy-list…" Ex. 1002 at col. 8, ll. 32-36.

### j) Newman Discloses Limitation 1[j]

Newman discloses limitation 1[j]. Newman discloses providing location information and the fact that there is an emergency to the user's emergency contacts.

> If information resource Location Storage 118 contains the emergency distress signal, Device Location Update 120 forwards this signal, i.e., emergency indicator, in response to decision 122. Emergency services and/or a designated contact, as initially selected by the subscriber at the time of purchase or leasing the emergency PCS device 100, are notified via Notify Emergency Services or Designated Contact 124 for subsequent action.

41

Ex. 1004 at col. 5, ll. 48-55.  Emergency contacts may also view the location and location-related information online.  "The inquirer can access the location information stored in the database via a voice response system or a computer link to the database."  *Id*. at col. 7, ll. 58-61.  As shown in Fig. 3, by accessing the database, the emergency contact would be able to see the location (address) of the user and whether the user has activated the emergency beacon.

### E.      GROUND 5 – Claim 1 is Anticipated By Kenichi

Japanese Patent Pub. No. 2000-322446 ("Kenichi") is titled "System and Method for Providing Information," and discloses a service wherein the users of GPS-enabled wireless devices may submit their location information and information about the location, such as a photo or comments, to a bulletin board using a "MM Mail."  *See, e.g* Ex. 1006 at ¶ 17.  The system receives the location information and additional information and posts it to a bulletin board in the form of a map called "My Map,"  "Friend Map," or "All Map."  *See, e.g., id.* at ¶¶ 18-19.  Each user's My Map is privately maintained unless the user gives "friends" permission to view their My Map through "Friend Map."  *Id*. at ¶ 20.

Kenichi is one of several patents and publications relating to a Seiko Epson product called "Locatio," which was available in Japan as early as 1998.  For example, both Kenichi and the Locatio Beginner's Guide (Ex. 1014), which was published August 30, 1999, discuss the MM Mail feature of Locatio.  *See* Ex. 1014

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

at 71-72, 146-147, 164-165, 168-169, 174, 177, and 179. Kenichi was published on Nov. 24, 2000, prior to the non-provisional application for the '165 Patent. Therefore, as stated in Part VI, *supra*, Kenichi qualifies as prior art at least under 35 U.S.C. § 102(a) (pre-AIA).

### a) Kenichi Discloses Limitation 1[a]

Kenichi discloses the preamble of claim 1. Kenichi explains that when a user is preparing an MM Mail to post information to My Map, they have the option of also displaying their email address and their street address. *See, e.g.* Ex. 1006 at ¶ 49.

### b) Kenichi Discloses Limitation 1[b]

With regard to limitation 1[b], Kenichi discloses allocating a user-specific space on "WWW server 1" in the form of the user's "My Map." Each user is allotted "MM memory" on server 1, where the user can upload their location-relevant content. *See id.* at ¶ 19. "The My Map function 21 is a service for viewing the content (MM memo) that the user himself uploaded to the WWW server 1. This service allows the user to write a comment in text in the MM memory he uploaded himself or to display the location information of the MM memo. Further, the uploaded MM memo is only viewable to the uploader himself." *Id.*

      c)      **Kenichi Discloses Limitation 1[c]**

With regard to limitation 1[c], Kenichi states that when a user wishes to upload MM Mail, they must first login, using their identification number and password.

> First, a connection with the WWW server is established via the Internet and the bulletin board service 8 is selected. Then, the user is prompted to enter his ID number and password, followed by the main menu shown in Figure 2 or Figure 3 being displayed. Figure 2 is a display example of the monitor of a portable terminal 3, such as a PDA… Either set of display data is data displayable by a browser that the terminal is running such as HTML data, and is distributed to the terminal from the WWW server 1.

*Id*. at ¶ 26. This identification information is associated with the user's MM Mail, and can be displayed by friends viewing the user's My Map, as shown in Fig. 2. *See also id*. at ¶ 5:

> Further, in order to output a desired content from among a plurality of contents stored together with identification information and relevant location information, the information providing method of the invention comprises: a first selection display process for enabling the selection of a desired content by outputting a plurality of identification information as a list and a second selection display process for enabling the selection of a desired content by outputting a display that is based on location information onto a map.

### d) Kenichi Discloses Limitation 1[d]

With regard to limitation 1[d], Kenichi describes a method of determining a geographic location of the user by activating the PDA's GPS capabilities, receiving GPS coordinates, iconifying the GPS coordinates, and then pasting it into an MM Mail to be sent by the user.

> MM mail was developed as a mail format for a handy-type information processing terminal (PDA) 3, and can handle not only picture data acquired from a digital camera or the like as well as text data entered by the user but also the location information (GPS information or map information) of himself measured by radio waves from a satellite 4 as well as audio and other voice information captured by a microcomputer. This MM mail can be transmitted or received while containing, as the main body of text of the electronic mail, a content that shows a picture and characters overlapping with each other. Further, it is also possible to convert the map information to icons and to paste them to the main body of the electronic mail. Then, the content transmitted in MM mail becomes stored as a MM memo in a format capable of displaying the same content as that of the MM mail.

*Id.* at ¶ 17.

### e) Kenichi Discloses Limitation 1[e]

With regard to limitation 1[e], Kenichi explains that MM Mail is received by the system, and stored in the user's own "My Map," within "MM Memory," in

WWW server 1.

> The My Map function 21 is a service for viewing the content (MM memo) that the user himself uploaded to the WWW server 1. This service allows the user to write a comment in text in the MM memory he uploaded himself or to display the location information of the MM memo. Further, the uploaded MM memo is only viewable to the uploader himself.

*Id*. at ¶ 19.

> When My Map 51a is selected in the Memo Map menu 51, the entire memo list 52 shown in Figure 4 becomes displayed by default. This memo list 52 vertically displays the titles 52a of multiple contents that the user himself registered in the order of dates. When a desired title 52a is clicked, the content registered by the title becomes displayed. … As explained earlier, the content of a MM memo containing location information or picture information becomes registered via the mail server 2.

*Id*. at ¶ 28.  Therefore, Kenichi stores location data within the user-specific space.

### f)    Kenichi Discloses Limitation 1[f]

With regard to limitation 1[f], Kenichi states that the user may upload information relating to the user and their location, such as photographs or comments, using MM Mail.

> MM mail was developed as a mail format for a handy-type information processing terminal (PDA) 3, and can handle not only picture data acquired from a digital camera or the like as well as text

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

data entered by the user but also the location information (GPS information or map information) of himself measured by radio waves from a satellite 4 as well as audio and other voice information captured by a microcomputer. This MM mail can be transmitted or received while containing, as the main body of text of the electronic mail, a content that shows a picture and characters overlapping with each other. Further, it is also possible to convert the map information to icons and to paste them to the main body of the electronic mail. Then, the content transmitted in MM mail becomes stored as a MM memo in a format capable of displaying the same content as that of the MM mail.



*Id.* at ¶ 17.  As shown in drawing 8, Kenichi discloses sending a photo of a location, along with the GPS coordinates and commentary regarding that location, using MM Mail.

> ### g)    Kenichi Discloses Limitation 1[g]

Kenichi also discloses limitation 1[g].  As explained with regard to limitation 1[e], above, Kenichi explains that each MM Mail is received by the system, and stored in the user's own "My Map," within "MM Memory," on WWW

47

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

server 1.  *Id*. at ¶¶ 16-17.

### h)     Kenichi Discloses Limitation 1[h]

With regard to limitation 1[h], Kenichi discloses that an MM Mail user can

create a list of friends who have access to the user's My Map.

> The Friends Map function 22 is a closed service that allows the user to
> freely create [contents] and share them with the other users.
> Therefore, content uploaded by specifying a group in the Friends Map
> 22 mode can be viewed by any member of the group and cannot be
> viewed by members not belonging to the group. There is also a
> service capable of outputting the profile or a map corresponding to the
> location information of each member of the group that the user
> belongs to. Moreover, in the same manner as the function of My Map
> 22, it is also possible to write a comment in text in an uploaded MM
> memo or to display a map based on the location information of the
> MM memo.

*Id*. at ¶ 20.  Therefore, Kenichi discloses limitation 1[h].

### i)     Kenichi Discloses Limitation 1[i]

With regard to limitation 1[i], Kenichi explains that My Map friend lists and

group permissions are stored in WWW server 1 and managed by API 32.

> To support these bulletin board functions, the WWW server 1 also has
> function groups such as a member control server 31 for managing
> member information, a grouping API 32 for providing grouping
> information based on [the member control server], a content API 33
> for providing content from the content serer 11, and a grouping

48

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

content API 34 for managing the contents made public to the group.

*Id*. at ¶ 22.  Therefore, Kenichi discloses limitation 1[i].

### j)      Kenichi Discloses Limitation 1[j]

With regard to limitation 1[j], Kenichi discloses that My Map friends may view the contents of other users' MM Mail, which has been uploaded to a map, by selecting a thumbnail pasted on the map that is linked to the contents of the MM Mail message.

> Therefore, the map displays the dispersed contents provided by multiple users. It is possible to use thumbnails or the like to make it possible to know the overview of the user or the content. This makes it possible for the user to select a desired content from among the contents available to him based on location, which is the new identification information, in addition to the conventionally used identification information such as title and user name. Also, since the location pertaining to a content is indicated on a map in a manner such that its visual recognition is easy instead of using numeric values, it can be fully taken advantage of as an element used for selecting a content through easy recognition.

*Id*. at ¶ 41.  Kenichi explains that location-related content regarding other users may be selected from a list display (as shown in Fig. 11,) or from a map display, as shown in Fig 12).  *See id*. at ¶¶ 40-41.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165



[FIGURE 11]

[FIGURE 12]

### F.     GROUND 6 – Claims 2-5 and 7-9 Are Obvious Over Kenichi in View of Makoto

Kenichi also discloses all of the limitations of claim 2 of the '165 Patent and

the claims that depend therefrom, with the possible exception of limitations 2[c]

and 8[a].  However, these limitations are disclosed by Japanese Patent Pub. No.

2000-275319 ("Makoto").  Makoto describes the GPS Server architecture for the

Seiko Epson Locatio device.   For example, Makoto and Kanichi were both

assigned to the Seiko Epson Corporation at the same time that Seiko Epson was

marketing the Locatio product in Japan (1999).   Furthermore, the Locatio

Beginner's Guide states that Locatio employed a "DGPS" system, s*ee* Ex. 1014 at

77-78, and Makoto describes "[a] GPS server 22 collects navigational messages

and data received at a DGPS base station 2 for every fixed period of time, and

corrects the navigational messages by calculating the position of the GPS satellite

9, which is stored."  Ex. 1008 at Abstract.  Thus, because Kanichi and Makoto both

50

relate to the same invention, there is a strong motivation to combine these two

prior art references.  *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).

Makoto was published on June 10, 2000, prior to the non-provisional application

for the '165 Patent.  Therefore, as explained in Part VI, *supra* Makoto qualifies as

prior art at least under 35 U.S.C. § 102(a) (pre-AIA).

### a)  Kenichi Discloses Limitation 2[a]

With regard to the preamble of claim 2, Kenichi discloses and claims a

location-relevant server system.  For example, claim 9 of Kenichi claims "[a]n

information providing system … having a server system that is equipped with a

means for storing the abovementioned plurality of content together with the

identification information and location information and that can distribute the

contents to a terminal system via a computer network." Ex. 1006 at claim 4.

### b)  Kenichi Discloses Limitation 2[b]

With regard to limitation 2[b], Kenichi states that the mobile device used

with the invention, is capable of determining its GPS coordinates and

communicating wirelessly through a PHS or cellular network.

> [T]he portable terminal 3 of the present example can carry out
> electronic positioning by using the GPS satellite 4 and can freely
> acquire location information. Therefore, the user's own location
> information that used to be virtually meaningless when a stationary
> terminal connected to the Internet was utilized can be made significant

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> as information, and the bulletin board service 8 can utilize the location
> display as one of the content selection standards. The method for
> obtaining the location information is not limited to using the GPS
> satellite. For instance, it is possible to obtain the user's own location
> based on the relationship with the PHS base station. By connecting the
> portable terminal 3 to the Internet 6 by means of a PHS or cellular
> phone, the use of the bulletin board service 8 becomes possible.

*Id*. at ¶ 55. Therefore, Kenichi discloses limitation 2[b].

### c) Kenichi Discloses Limitation 2[c] in View of Makoto

With regard to limitation 2[c], Kenichi inherently discloses a server
architecture using a GPS Server. However, the details regarding the GPS Server of
Kenichi are disclosed in Makoto. Makoto describes a GPS server 22 that receives
location-relevant information from an email server, performs GOS data correction
on the location information, and then forwards the message with the corrected GPS
location information to an information service system.

> Returning to Figure 1, the information presentation system 20 is
> equipped with a mail server 21 connected to the internet 1 and a GPS
> server 22 that is connected through this email server 21 or directly to
> the internet 1 to send and receive information. The GPS server 22
> collects navigational messages and data received from each GPS
> satellite 9 from the plurality of DGPS base stations 2 located across
> the country, for example (the data received is collected on a regular
> basis), and the corrected navigational messages are calculated and
> saved. The GPS server 22 also analyzes emails addressed to the GPS

> server 22 from the user to the mail server 21, and corrected
> navigational messages for positioning suited to the location where the
> emails are sent have a function that can send (transmit, submit) back
> to the originator of the email.

Ex. 1008 at ¶ 32.  Makoto also explains that the GPS Server may correct the

location information within an MM Mail message before sending the corrected

message to the system.

> As indicated before, there are two types of methods ready to obtain
> corrected navigational messages for positioning from the GPS server
> 22 via the internet. One is the method using a store and forward type
> of information presentation system using email exchanges through a
> mailbox 23 on the mail server 21. The other method is a method to
> obtain corrected navigational messages for positioning by extending
> the direct connection with the GPS server 22 using the special
> protocol.

*Id.* at ¶ 38.  In either case, Makoto discloses a GPS Server which receives location

information, corrects that information, and then forwards the corrected location

information to an application server, in much the same way as the embodiments

disclosed in the '165 Patent.  For example, the '165 Patent states that "[i]n one

embodiment, error correction processing is also performed by the wireless GPS

server, thereby further allowing reduced single processing on the part of the PCD."

Ex. 1001 at col. 3, ll. 59-61.  This is precisely the function and purpose of the GPS

Server described in Makoto.  Therefore, Kenichi discloses limitation 2[c] in view

of Makoto.

### d) Kenichi Discloses Limitation 2[d]

With regard to limitaiton 2[d], Kenichi explains that the WWW server 1 receives the MM Mail messages from the mail server 2, and then executes a CGI script to store the contents in the content library on WWW server 1.

> The WWW server 1 that is the center of this bulletin board service 8 is equipped with a bulletin board client gateway interface (CGI) 10, which provides bulletin board services, in addition to a mail server 2 that transmits and receives mail via the Internet 6. This allows the user to select a desired content from among the text, image, and audio stored in the content server, or contents that are combinations of these elements, via the Internet 6 and to output it to their handy terminal, PDA, a desktop computer, etc.

Ex. 1006 at ¶ 15. Figure 1 from Kenichi shows the server architecture, including the CGI gateway interface 10. Notably, the '165 Patent also describes using a CGI script in order to receive and store location and



location-related information. "In one application the application server and the wireless GPS server communicate using a hypertext transfer protocol (HTTP) and

54

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

the wireless GPS server requests that application server execute a CGI script or program making use of the PCD identifier and the PCD location data." Ex. 1001 at col. 4, ll. 7-11.

WWW server 1 in Kenichi is also configured to allow users different access to the server based on the identity of the user. Kenichi discloses that an MM Mail user can create a list of friends who have access to the user's My Map.

> The Friends Map function 22 is a closed service that allows the user to freely create [contents] and share them with the other users. Therefore, content uploaded by specifying a group in the Friends Map 22 mode can be viewed by any member of the group and cannot be viewed by members not belonging to the group. There is also a service capable of outputting the profile or a map corresponding to the location information of each member of the group that the user belongs to. Moreover, in the same manner as the function of My Map 22, it is also possible to write a comment in text in an uploaded MM memo or to display a map based on the location information of the MM memo.

Ex. 1006 at ¶ 20. Kenichi also explains that Friend Map friend lists and group permissions are stored in WWW server 1 and managed by API 32. *See id*. at ¶ 22. Therefore, Kenichi discloses limitation 2[d].

> e)   **Kenichi Discloses Limitation 2[e]**

With regard to limitation 2[e], Kenichi discloses that an MM Mail user can create a list of friends who have access to the user's My Map. *Id.* at ¶ 20. Kenichi also

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

explains that My Map friend lists and group permissions are stored in WWW
server 1 and managed by API 32. *See id.* at ¶ 22. Therefore, Kenichi discloses
limitation 2[e].

### f) Kenichi Discloses Limitation 2[f]

With regard to limitation 2[f], Kenichi states that the user uploads various
information relating to the user and their location, such as photographs or
comments, using MM Mail.

> MM mail was developed as a mail format for a handy-type
> information processing terminal (PDA) 3, and can handle not only
> picture data acquired from a digital camera or the like as well as text
> data entered by the user but also the location information (GPS
> information or map information) of himself measured by radio waves
> from a satellite 4 as well as audio and other voice information
> captured by a microcomputer. This MM mail can be transmitted or
> received while containing, as the main body of text of the electronic
> mail, a content that shows a picture and characters overlapping with
> each other. Further, it is also possible to convert the map information
> to icons and to paste them to the main body of the electronic mail.
> Then, the content transmitted in MM mail becomes stored as a MM
> memo in a format capable of displaying the same content as that of
> the MM mail.

*Id.* at ¶ 17. As shown in drawing 8 (shown in Part VII(E)(f), *supra*), Kenichi
discloses sending a photo of a location, along with the GPS coordinates and

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

commentary regarding that location, using MM Mail.  *See* Ex. 1006 at Fig. 8.  As

such, Kenichi discloses limitation 2[f].

### g)   Kenichi Discloses Limitation 3[a]

With regard to dependent claim 3, Kenichi discloses that My Map friends or

members of the same bulletin board May view the contents of other users' MM

Mail, which has been uploaded to a map, by selecting a thumbnail pasted on the

map, which has been linked to the contents of the original MM Mail message.

> [T]he map displays the dispersed contents provided by multiple users.
> It is possible to use thumbnails or the like to make it possible to know
> the overview of the user or the content. This makes it possible for the
> user to select a desired content from among the contents available to
> him based on location, which is the new identification information, in
> addition to the conventionally used identification information such as
> title and user name. Also, since the location pertaining to a content is
> indicated on a map in a manner such that its visual recognition is easy
> instead of using numeric values, it can be fully taken advantage of as
> an element used for selecting a content through easy recognition.

*Id*. at ¶ 41.  Kenichi explains that location-related content regarding other users

may be selected from a list display (as shown in Fig. 11,) or from a map display, as

shown in Fig 12) (shown in Part VII(E)(j), *supra*).  *See id*. at ¶¶ 40-41.  Therefore,

Kenichi discloses limitation 3[a].

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### h) Kenichi Discloses Limitation 4[a]

Kenichi also discloses dependent clam 4. As explained with respect to limitation 2[d], *supra*, Kenichi discloses modifying the information within WWW server 1 through the use of a CGI script, much like the methods disclosed in the '165 Patent. Therefore Kenichi discloses limitation 4[a].

### i) Kenichi Discloses Limitation 5[a]

Kenichi also discloses dependent claim 5. As discussed in Part VII(E)(a), when a user is preparing an MM Mail to post information to My Map, they have the option of also displaying their email address and their street address.

Next, there is an area 64c for entering the electronic mail address of the user, and this area is provided with an area for indicating whether or not to make the address public and for entering the address itself. This is followed by an area 64d for setting whether or not to make the location information public.



*Id.* at ¶ 49. Figure 17 of Kenichi (above) also shows the setup screen for an MM Mail. Therefore, Kenichi discloses limitation 5[a].

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

### j) Kenichi Discloses Limitation 7[a]

Kenichi also discloses dependent claim 7. As stated with respect to limitation 2[d]. WWW server 1 in Kenichi is also configured to allow users different access to the server based on the identity of the requester. Kenichi discloses that an MM Mail user can create a list of friends who have access to the user's My Map using a feature called "Friend Map." *See id*. at ¶ 20. Therefore, Kenichi discloses limitation 1[h]. Kenichi also explains that My Map friend lists and group permissions are stored in WWW server 1 and managed by API 32. *See id*. at ¶ 22. Therefore, Kenichi discloses limitation 2[d].

### k) Kenichi Discloses Limitation 8[a] in View of Makoto

With regard to limitation 8[a], Kenichi discloses that "individual contents are stored together with the location information pertaining to the contents such as the latitudes and longitudes of the sources of the contents in addition to identification information such as the titles and creators of the contents…" *Id*. at ¶ 5. Thus, it may be inferred that the GPS Server of Kenichi sends PCD locations and identifiers to the application server, although this is not expressly stated. However, Makoto expressly discloses limitation 8[a]. MM Mail is described as using an email function to store and transfer location and location-related information. The GPS Server of Makoto uses this same email function to transfer corrected location information.

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

> Various types of GPS receivers 6 can be connected, … , either wired,
> or wirelessly with a dial up IP connection to the provider server 5
> connected to the internet. The request to submit corrected navigational
> messages for positioning from these GPS receivers 6 is transmitted to
> the mail server 21 or the GPS server 22 according to email or special
> protocol.

Ex. 1009 at ¶ 34. Because the corrected MM Mail message is sent back to the mail
server to be forwarded to the application server, it will employ the same email
address as the original MM Mail message. Thus, the sender's email address serves
as an identifier that is provided by the GPS Server to the Application Server.

### l) **Kenichi Discloses Limitation 9[a]**

Dependent claim 9 is virtually identical to limitation 5[a] and is therefore
anticipated by Kenichi for the reasons stated in Part VII(F)(i), above.

## VIII. CONCLUSION

Based on the foregoing, there is a reason able likelihood that at least one of
claims 1-5 and 7-9 of the '165 Patent is invalid. Accordingly, this Petition for *inter
partes* review of the '165 Patent should be granted.

Dated: November 18, 2013          By:  /s/ Craig R. Smith
                                       Craig R. Smith

Craig R. Smith (Reg. No. 45,113)       Main: (617) 395-7081
William J. Seymour (Reg. No. 64,990)   Fax: (617) 395-7070
LANDO & ANASTASI LLP                   csmith@lalaw.com
One Main Street                        wseymour@lalaw.com
Cambridge, MA 02142                    *Counsel for Petitioner*
                                       *Foursquare Labs, Inc.*

Petition for *Inter Partes* Review of
U.S. Patent No. 7,343,165

## Certificate of Service in Compliance with 37 CFR § 42.6(e)(4)

The undersigned certifies that a complete copy of this Petition for *Inter Partes* Review and Exhibits 1001 – 1021 were served by electronic mail, by agreement of the parties, on November 18, 2013 to the attorney of record for the '165 Patent, Daniel M. Cavanagh, Klein, O'Neill & Singh, LLP, 18200 Von Karman Ave., Suite 725, Irvine CA 92612 (dacavanagh@koslaw.com). A courtesy copy of the petition is also being served by electronic mail on the counsel of record for Silver State in the Nevada action, Frederick S. Berretta, at Knobbe, Martens, Olson & Baer, LLP, 12790 El Camino Real San Diego, CA 92130 (Fred.Berretta@knobbe.com).

By: /Craig R. Smith/
    Craig R. Smith (Reg. No. 45,113)
    William J. Seymour (Reg. No. 64,990)
    LANDO & ANASTASI LLP
    One Main Street
    Cambridge, MA  02142
    Main:  (617) 395-7081
    Fax: (617) 395-7070
    csmith@lalaw.com
    wseymur@lalaw.com